Michael TONEY, individually and on behalf of all others who are similarly situated, Plaintiff,

v.

Roland BURRIS, individually and in his official capacity as Comptroller of the State of Illinois, Defendant.

No. 86 C 3333.

United States District Court, N.D. Illinois, E.D.

Oct. 31, 1986.

Walter S. Clifton, Burnell Dixon, Urbana, Ill., for plaintiff.

Alison Breslauer, Gladys Stevens, Ill. Atty. General's Office, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

Plaintiff Michael Toney has brought this action pursuant to 42 U.S.C. § 1983 to challenge the constitutionality of an Illinois statutory and regulatory procedure which authorizes defendant Roland Burris, Comptroller of the State of Illinois, to withhold certain portions of a state employee's wages if the defendant ascertains that the employee is indebted to the state. Plaintiff contends that this procedure, both on its face and as applied to him, denies him notice of the proposed withholding and an ·opportunity to be heard on the current collectibility of the indebtedness. This lack of notice and opportunity to be heard, plaintiff claims, is a denial of the four-

teenth amendment guarantee that the state not deprive a person of his property without due process of law. Plaintiff prays for declaratory and injunctive relief.

Presently before the court are several motions. Plaintiff has moved for a preliminary injunction, waiver of the security requirement for issuance of the preliminary injunction, class certification, and summary judgment. Defendant, who is sued in both his official and individual capacities, opposes all these motions except for the waiver of security, and raises his own motion for abstention. Because the court is able to render a final order in this case, the motions for preliminary injunction and waiver of security are moot. For the reasons given below, the court denies the motion for abstention, grants the motion for class certification, and grants the motion for summary judgment.

### I. Summary of the Facts

In identifying whether there are undisputed facts in a case, the court on a motion for summary judgment must construe all the evidence in the record in a light most favorable to the non-movant, in this case the defendant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 459–60 (7th Cir.1986). With this principle in mind, the court finds the following to be undisputed facts.

Plaintiff is currently an employee of the State of Illinois. He applied for and received two Illinois Guaranteed Student Loans totaling $6,860.00 in principal. The loans were provided to him in 1978 and 1979 at an interest rate of 7% by the First National Bank of Chicago, The Illinois State Scholarship Commission ("ISSC") acted as guarantor of plaintiff's obligation to repay this debt to the bank.

On May 5, 1983, the ISSC received a "Lender Request for Purchase" of plaintiff's loan from the bank. The bank requested that the ISSC purchase plaintiff's loan because of plaintiff's failure to sign a payout note as required. Pursuant to the bank's request, the ISSC reimbursed the bank.

On January 6, 1986, plaintiff was mailed a notice of the ISSC's intent to request the defendant to offset a portion of plaintiff's paycheck to reduce plaintiff's indebtedness to the state. The form of this notice is important. Unfortunately, an exact copy of this notice has not been supplied to the court. Instead, defendant provides the court with an undated form letter. See Ex. 10 to Deft.'s Br. However, according to the affidavit of Judy McCauley, Collection Specialist III of the ISSC, this form letter is the type of letter that plaintiff was mailed on January 6, 1986. See *id.* ¶ 5. The letter asserts that plaintiff's loan account is past due and that the State has the right to withhold his entire paycheck, or a portion thereof, to make the payments against his debt to the state. The letter provides plaintiff with no opportunity to contest the validity of the indebtedness. It only allows him to "prevent initiation of the offset procedure" by remitting "the entire past due amount immediately." (Appendix A).

Plaintiff had been sent similar notices on January 11, 1984, December 7, 1984, and April 22, 1985. The January 11, 1984 letter was apparently slightly different from the January 6, 1986 letter. Compare Ex. 11 of Deft. Br. (January 11, 1984 letter) with *id.* Ex. 10 (January 6, 1986 letter). (Appendix B). The December 7, 1983 and April 22, 1985 letters were of the same form as the January 6, 1986 letter. See McCauley aff. ¶ 3. Subsequent to the January 11, 1984 letter which notified plaintiff of the ISSC's intent to request an offset, plaintiff made payment arrangements with the ISSC which called for monthly payments in accordance with a revised payment schedule. Because of this revised schedule, the ISSC did not request the defendant to offset wages per the January 11, 1984 letter. It is not disclosed in the record why the ISSC did not request an offset subsequent to the issuance of the December 7, 1984 and April 22, 1985 letters of intent, although it may be reasonably assumed the plaintiff's ina-

bility to keep to the revised payment schedule precipitated the issuance of those letters as well as the final January 6, 1986 letter of intent. As just stated, these last three letters all were of the same form and informed plaintiff of the ISSC's intent to request an offset of wages on account of an asserted indebtedness to the state. They did not, however, inform him of or provide him with any sort of opportunity to challenge the indebtedness.

On February 13, 1986, subsequent to the January 6, 1986 letter, the ISSC requested the defendant to withhold $280.00 from plaintiff's wages. The offset itself occurred on April 12, 1986. Specifically, on this date the defendant began holding the withheld funds temporarily, with the intention of eventually remitting those funds to the requesting State agency, the ISSC. See Deft.Br. at 6. About one-fifth of plaintiff's after-tax wages were withheld. On April 17, 1986, plaintiff received a letter from defendant's office notifying plaintiff that the withholding had taken place. The letter informed plaintiff of his right to protest in writing and within thirty days the withholding. (Appendix C). If no protest was received within thirty days, the funds would then be remitted to the requesting state agency.

On April 1, 1986, prior to the April 12, 1986 withholding of plaintiff's wages, plaintiff filed a petition for bankruptcy. The particular debt which defendant is attempting to collect through its withholding-of-wages powers was listed on the bankruptcy petition. On August 11, 1986 this debt was discharged in bankruptcy.

## II. The Challenged State Laws

Plaintiff contends not only that the particular manner in which his wages were withheld denied him due process of law, but that the statutory and regulatory authority which empower the defendant to withhold wages is constitutionally invalid on its face. Because this issue must be addressed, the court now lays out that authority.

The statutory authority for wage withholding is located at Ill.Rev.Stat. ch. 15, ¶ 210.05.

Whenever any person shall be entitled to a warrant [such as wages] from the treasury ... against whom there shall be any account or claim in favor of the State, then due and payable, the Comptroller, upon notification thereof, shall ascertain the amount due and payable to the State, as aforesaid, and draw a warrant on the treasury ... stating the amount for which the party was entitled to a warrant ... the amount deducted therefrom, and on what account, and directing the payment of the balance.... The Comptroller may deduct the entire amount due and payable to the State or may deduct a portion of the amount due and payable to the State in accordance with the request of the notifying agency....

A related paragraph, *id.* at ¶ 221, provides the Comptroller with rule making powers:

The comptroller shall promulgate rules and regulations to implement the exercise of his powers and performance of his duties under this Act and to guide and assist State agencies in complying with this Act.

Pursuant to this power, Ill.Admin.Code tit. 74, §§ 285.1100–285.1109 delineate the specific manner in which wages may be withheld. These regulations were in effect at the time of plaintiff's offset. Section 285.1102 provides:

a) The Comptroller will not process a claim under Section 10.05 until he has received notification that an account or claim in favor of the State is then due and payable against the person entitled to a warrant on the State treasury or on other funds held by the State Treasurer.

b) For purposes of Section 10.05 of the Act and these rules promulgated pursuant thereto, "notification" of an account or claim in favor of the State shall be deemed to occur when the State agency in favor of which the account or claim has arisen has sub-

mitted to the Comptroller, in such form as the Comptroller may designate, a written statement, thereof, which statement must contain the following information:

1) the name, address and Social Security Number or Federal Employer's Identification Number of the person against whom the claim exists;

2) the amount of the claim then due and payable to the State;

3) the reason why there is an amount due to the State (i.e., income tax liability, overpayments, etc.);

4) the time period to which the claim is attributable;

5) the fund to which the debt is owed; attempts, if any, which the agency has made to collect the claim; and

6) any other information which is needed to describe the claim in favor of the State. . . . [1]

Section 285.1104 states in part:

The following provisions shall govern the processing of a claim under Section 10.05 of the Act:

a) Before making an offset, the Comptroller shall review the information provided by the agency notifying him of a claim and shall ascertain therefrom the amount due and payable to the State.

b) The Comptroller shall make all offsets against the net amount of the warrant. . . .

Section 285.1106 requires the Comptroller to notify the wage earner that a state agency has requested an offset and that the wage earner may protest the claimed indebtedness:

a) Upon processing a Section 10.05 claim, the Comptroller shall, as soon as practicable, give notice in writing to the person subject to the offset which notice:

1) shall state that a request has been made pursuant to Section 10.05 of the State Comptroller Act to make an offset against any warrant on funds held by the State Treasurer which is now or which may become payable to that person;

2) shall be accompanied by a copy of the notification filed by the State agency with the Comptroller; and

3) shall inform the person that, if he or she does not owe any or all of the amount claimed to be due and payable to the State, the person may, within 30 days of the Comptroller's giving notice, make a written protest as prescribed in subsection (b) of this Section . . .

b) Persons wishing to make a protest to the Section 10.05 offset shall, within 30 days of the Comptroller's giving notice as prescribed in subsection (a), notify the Comptroller in writing of:

1) the reasons for contesting the claim of the State;

2) the amount, if any, that the person acknowledges to be due and payable to the State; and

3) any other information that will enable the Comptroller to determine the amount, if any, that is due and payable to the State.

c) Upon receipt of a timely protest, the Comptroller shall determine the amount due and payable to the State. This determination shall be made in light of all information relating to the transaction in the possession of the Comptroller and any other information the Comptroller may reasonably request and obtain from the State agency and the person subject to the offset. . . .

Finally, Section 285.1107 provides:

Whenever the Comptroller exercises his authority granted under Section 10.05,

---

**1.** This quotation is reprinted from the published Illinois Administrative Code. Defendant has supplied this court with a copy of what purports to be § 285.1102 of the Code. It is reproduced from the Illinois Register and is materially different from what now appears in the bound compilation of the Illinois Administrative Code. The court, therefore, regards defendant's version as unauthoritative.

the person subject to the offset and the agency that originated the voucher shall be sent a copy of the voucher against which the deduction was made, along with a written statement of the reason for the deduction which shall indicate the amount of money deducted.

## Threshold Issues

### A. Abstention.

■ Plaintiff has asked this court to decide the constitutionality of the fund withholding procedure just described. Defendant requests that this court abstain from deciding this question because the state statute and regulations may be susceptible to an interpretation by the state court which conforms with the constitution. If this is true, then *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), teaches that abstention is appropriate because the need for deciding the federal constitutional question is obviated and a federal court, as an act of prudence, should avoid deciding constitutional issues unnecessarily. This principle is relevant only in relation to plaintiff's facial attack of the Illinois statute and regulations. Plaintiff's related claim that he did not in fact receive due process is not an issue which can be avoided by an interpretation of state law. It can be decided only by an examination of whether, under the facts of this case, the process plaintiff actually received was constitutionally adequate. Therefore, the court will not abstain from deciding plaintiff's "as applied" claim.

■ This case also appears to be an inappropriate one for abstaining on the facial issue. As will be more fully elaborated later in this opinion, the state laws are not reasonably susceptible of an interpretation that comports with due process. Accordingly, the court need not restrain itself from deciding the facial validity of the law.

### B. Class Certification.

■ Plaintiff has moved this court to certify this case as a class action brought on behalf of all persons who have had or will have their funds withheld by the defendant acting pursuant to Ill.Rev.Stat. ch. 15, § 210.05. Under Fed.R.Civ.P. 23(a), an action may be maintained as a class only if four prerequisites are met. The class must be so numerous that joinder is impracticable; there must be questions of law or fact common to the class; the claims of the representative must be typical of the class; the class representative must fairly and adequately protect the class. These are not the only prerequisites relevant here. In addition to the above four prerequisites, this action may be maintained as a class action only if the party opposing the class has acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. Fed.R.Civ.P. 23(b)(2).

Defendant resists this class certification by arguing that the plaintiff cannot adequately represent those who have already had their funds withheld because plaintiff seeks only injunctive and declaratory relief. This is not persuasive. First, plaintiff himself has had his funds already withheld. More importantly, it would be futile for him to pursue a claim for retroactive damage relief since such actions are barred by the eleventh amendment. *See Edelman v. Jordan*, 415 U.S. 651, 657, 94 S.Ct. 1347, 1353, 39 L.Ed.2d 662 (1974). His claims for prospective relief are therefore representative of all those who will have *or* have had their funds withheld.

Next, defendant maintains that because plaintiff supposedly received notice of and an opportunity to be heard on his offset, his claims are not typical of the rest of the class, and do not share common questions of law or fact with the class. The court disagrees. Plaintiff's class certification motion contends that the notice and opportunity he and the class received were constitutionally inadequate. Defendant offers no reason to believe that the notice and opportunity provided to plaintiff are unique to him alone. Indeed, the whole tenor of defendant's brief is that the process plaintiff received is that required by state law.

See, *e.g.*, Deft.Br. at 6. Defendant certainly never even suggests that the process plaintiff received was not authorized by the state withholding statute and regulations. Plaintiff's claim is therefore typical of and common to the class.

Defendant's final argument against class certification is that in a case such as this, where equitable relief relating to a statute's validity is requested, there is no need for class certification because the relief requested would benefit all persons affected by the statute anyway. It is true that in this sort of case class certification is largely a formality. *See Galvan v. Levine*, 490 F.2d 1255, 1261 (2d Cir.1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2652, 41 L.Ed.2d 240 (1974). Nevertheless, Rule 23(b)(2) authorizes a class action when the defendant has acted in a way generally applicable to the class and injunctive or declaratory relief is appropriate. That is clearly the case here. Defendant's citation to Judge Nordberg's case, wherein he held that a class may not be certified when there is no need for certification, is inapposite. "In this circuit, ... it is clear that, if the prerequisites and conditions of Rule 23 have been met, 'a court may not deny class status because there is no "need" for it.'" *Vickers v. Trainor*, 546 F.2d 739, 747 (7th Cir.1976) (citing *Fujishima v. Board of Education*, 460 F.2d 1355, 1360 (7th Cir. 1972)). Since the prerequisites have been met here, class certification is appropriate.

The court now proceeds to examine the merits of plaintiff's claim of a procedural due process violation on account of the State's manner of withholding part of his wages.

## IV. The Merits

### A. The Relevant Law

■ The fourteenth amendment prohibits governmental actions which deprive "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. An inquiry into whether there has been a denial of procedural due process, as has been alleged here, has two steps. First, it must be established that the plaintiff has a life, liberty, or property interest. Second, it must be established that the plaintiff was deprived of that interest without being afforded the procedural protections mandated by the fourteenth amendment. In this case, defendant does not deny that plaintiff has a property interest in his earned wages. The Supreme Court has explicitly embraced such a conclusion in *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 340, 89 S.Ct. 1820, 1822, 23 L.Ed.2d 349 (1969) ("wages [are] a specialized type of property"). Similarly, all members of the class have a property interest in what the defendant has or will withhold from them. This is because the withholding statute authorizes the defendant to withhold part or all of a person's "warrant" on the state treasury, where a "warrant" is a person's entitlement to payment of public funds held by the state treasurer. See Ill.Rev.Stat. ch. 15, ¶ 209. Thus, in the general case, all class members have a property interest in what the defendant may withhold from them.

■ Having determined that plaintiff and the class have a property interest in the withheld funds, the next question is whether the Illinois withholding law guarantees them due process before they are deprived of their property. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (citations omitted). Due process protection applies not only to final, permanent deprivations of property, but even to temporary deprivations. *See North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 606, 95 S.Ct. 719, 722, 42 L.Ed.2d 751 (1975) ("That the debtor was deprived of only the use and possession of the property, and perhaps only temporarily, did not put the seizure beyond scrutiny under the Due Process Clause."); *Fuentes v. Shevin*,

407 U.S. 67, 86, 92 S.Ct. 1983, 1997, 32 L.Ed.2d 556 (1972) ("The Fourteenth amendment draws no bright lines around three-day, 10–day, or 50–day deprivations of property. Any significant taking of property by the State is within the purview of the Due Process Clause."). Once it is determined that due process applies to a property deprivation, the relevant inquiry becomes "what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

■ In *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the Supreme Court specifically outlined the factors relevant to the determination of what process is due, and accordingly when due process requires notice and a hearing *prior* to a deprivation of property. The inquiry requires consideration of (1) "the private interest that will be affected by the official action," *id.*, including "the importance of the private interest and the length or finality of the deprivation," *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434, 102 S.Ct. 1148, 1157, 71 L.Ed.2d 265 (1982); see *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 19, 98 S.Ct. 1554, 1565, 56 L.Ed.2d 30 (1978); (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value ... of additional or substitute procedural safeguards," *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute proceedings would entail." *Id.* As the Seventh Circuit has recently oberved:

> It is of some help to apply the *Mathews* tripartite test in light of the general rule, recently reiterated by the Supreme Court, that "absent an 'extraordinary situation' the power of the state to seize a person's property may not be invoked without prior notice and an opportunity to be heard." *United States v. $8,850*, 461 U.S. 555, 562 n. 12 [103 S.Ct. 2005, 2011 n. 12, 76 L.Ed.2d 143]; see *Fuentes v. Shevin*, 407 U.S. 67, 90 [92 S.Ct. 1983, 1999, 32 L.Ed.2d 556]; *Boddie v. Con-*

*necticut*, 401 U.S. 371, 378–379 [91 S.Ct. 780, 786–787, 28 L.Ed.2d 113]; *Breath v. Cronvich*, 729 F.2d 1006, 1010 (5th Cir. 1984), *cert. denied*, [469] U.S. [934, 105 S.Ct. 332, 83 L.Ed.2d 268].... *Miller v. City of Chicago*, 774 F.2d 188, 191 (7th Cir.1985), *cert. denied*, — U.S. ——, 106 S.Ct. 1949, 90 L.Ed.2d 358 (1986). Thus, under *Mathews*, "*pre*deprivation notice and hearing represent the norm and the state must forward important reasons to justify a departure therefrom." *Id.* (emphasis added).

■ A century of Supreme Court cases is consistent with this conclusion that only exceptional cases can justify a post-deprivation hearing. Typically, a post-deprivation hearing is adequate only when a public health danger exists and immediate action is necessary, as in *North American Cold Storage Co. v. Chicago*, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (unwholesome food), and *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (dangerous drugs); where there is an economic emergency, as in *Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944) (rent control orders during wartime); where a predeprivation administrative "paper hearing" is substantially reliable *and* is accompanied by a plenary post-termination hearing, as in *Mathews v. Eldridge, supra*, (social security terminations by way of medical assessments); and where a predeprivation proceeding is impracticable because of the random and unpredictable actions of state agents, as in *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (intentional but unauthorized property deprivations by state officials). However, in the absence of these narrow and exceptional circumstances, a predeprivation notice and opportunity to be heard is required.

Several district courts have had occasion to apply the *Mathews* test in contexts similar to that presented by this case. *Nelson v. Regan*, 560 F.Supp. 1101 (D.Conn.1983), *aff'd on other grounds*, 731 F.2d 105 (2d Cir.), *cert. denied sub nom. Manning v. Nelson*, 469 U.S. 853, 105 S.Ct. 175, 83

L.Ed.2d 110 (1984), involved a federal-state "intercept" program under which federal income tax refunds could be transferred to the state to the extent of a taxpayer's past-due family support obligations which the obligees had assigned to the state in return for welfare. Specifically, the state agency in charge of implementing the intercept program certified the names of individuals delinquent in their support obligations to the United States Treasury. After this step, the individuals were notified that their tax refunds may be intercepted to offset their delinquent support obligations assigned to the state and that questions about the individual's support obligations could be addressed to a certain state agent. These individuals were not told of any of the available defenses to the interception of tax refunds. More critically, the notice did not provide information about any procedure to challenge a refund offset. While agencies were provided to answer questions, there was no regular procedure to remedy errors. See *id.* at 1106.

A second notice was sent by the IRS to the taxpayer after the refund had been intercepted. The notice advised the taxpayer of the amount of the overpayment, the amount intercepted and the fact the intercepted overpayment had been paid to the state. The notice also advised the taxpayer that any questions about the obligation should be addressed to the named state agency. No provisions were made for regular procedures in which to challenge the state's claim for a refund. *Id.*

The court in *Nelson* held that the tax intercept procedure failed to comply with due process on two counts. First, "[b]oth the pre-intercept notice ... and the post-intercept notice ... fail to meet the due process requirements for notice. Neither mentions the possible defenses an individual might have to the interception of tax refunds or the availability of regular procedures in which to challenge the offset." *Id.* at 1107. "A clear and detailed predeprivation notification, specifying the possible defenses and the procedures for asserting those defenses, is necessary to afford due process protection to these individuals." *Id.*

The second deficiency of the tax intercept program was the failure to afford individuals an opportunity to be heard " 'at a meaningful time and in a meaningful manner.' " *id.* (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). In applying the *Mathews* factors, the court observed that the often vital private interest in receiving a tax refund of an anticipated amount substantially outweighed the important but relatively less urgent interest of the state in receiving the funds owed it. *Id.* Since a pre-deprivation opportunity to challenge the interception would not permanently deprive the state of its rights, and since it was easily practicable to provide claimants with additional procedural safeguards, the court found that the absence of hearing rights denied the plaintiffs due process. *Id.* at 1108–09. The court reached this conclusion noting that the balance of interests so strongly favored a pre-deprivation procedure that it was unnecessary to make any detailed findings pertaining to the likelihood of erroneous deprivations under the current procedures. *Id.* at 1109 n. 10. The court fashioned relief so as to redress both the "notice" and "hearing" deficiencies:

> Defendants must provide notice to all those whose tax refunds might be intercepted, specifying the possible defenses they might have and the availability of regular procedures in which to challenge the offset. They must also provide a predeprivation administrative review before an official with the authority to remove names from the list certified to the IRS. That review need not consist of a full adjudicative hearing, but must permit the complainant to appear personally and to present documentary evidence. The final administrative decision must be judicially reviewable, although not necessarily before the tax refunds are intercepted.

*Id.* at 1111.

Another federal district court has had an opportunity to consider the due process

implications of the federal tax intercept program as implemented in Rhode Island. *Marcello v. Regan*, 574 F.Supp. 586 (D.R.I. 1983). In Rhode Island, individuals would receive an initial letter from a state agency which informed the addressee that his or her tax refund might be retained to satisfy, in whole or in part, a past-due support obligation. The letter also noted the amount claimed to be past due and cautioned the addressee to contact the agency no later than a particular date. Those who made inquiries would prompt a state investigator to perform a "cursory" check of the arrearage records. A second letter would follow this check informing the addressee if any corrections in the claimed arrearage would occur. Other than this, there was no opportunity to challenge the interception either before or after it occurred. *Id.* at 596–97. Judicial review was not available. *Id.* at 597. Finally, since there were no formal records of these proceedings, the court found the whole process to be "inherently antipathetic to any meaningful judicial review of its administrative doings." *Id.* at 590.

Applying the *Mathews* test, the court recognized the substantial private interest in the tax refund. The deprivation of such an interest "could have a meaningful impact on the taxpayer's standard of living." *Id.* at 596. Moreover, the risk of an erroneous deprivation was found to be great by virtue of the complete absence of any challenge procedure, except a perfunctory, ex parte crosscheck of records. Although there were likely to be costs to additional procedural protections, the court held that in view of the high risk of undeserved deprivation and the potential for disruptive impact, additional procedural safeguards were required as a matter of due process. *Id.* at 597–98.

As to relief, the court ordered that notice of the proposed tax refund intercept take the following form:

The form of notice shall, in each instance, limn, in clear and concise language, possible defenses to the interception, including (without limitation of the generality of the foregoing) ... discharge in bankruptcy applicable to the support obligation, mistaken identity, and/or inaccuracy in the amount of past due support asserted.

*Id.* at 599. The court also outlined the procedural safeguards necessary to comply with due process:

The administrative review contemplated hereby must, .... be on a predeprivation basis, before a hearing officer or other official designated by the bureau. The hearing officer must be authorized to [correct errors]. While review need not rise to the dignity of a plenary adjudicative hearing, the procedure must permit each complainant personally to appear, to present relevant documentary evidence, and to examine the materials upon which the Bureau relied in making the certification. The administrative decision must be reviewable in the state courts ...; but the pendency of such judicial proceedings need not forestall nor delay the interception and disbursement of the tax refund in question. The decision of the hearing officer shall be in writing and shall be rendered within thirty days next following the close of evidence at the hearing....

Not all tax refund intercept programs have been held to be procedurally defective. In *McClelland v. Massinga*, 786 F.2d 1205 (4th Cir.1986), *rev'g* 600 F.Supp. 558 (D.Md.1984), the Fourth Circuit found that the procedures afforded family support obligors to challenge refund interceptions complied with federal due process.[2] In that case, Maryland empowered the administrator of its child support program to certify to the Comptroller any person in arrears of his court-obligated child support payments. If the administrator did so certify a person, he was then required to

---

**2.** Inexcusably, neither party advised this court that the district court opinion in *McClelland*, which plaintiff relies on, was reversed on appeal. Even more shocking is that the reversal occurred *before* briefing commenced on the pending motions here. The parties' failure to report a relevant reversal of a cited case is an appalling dereliction of duty to this court.

1238

notify the person of the certification and of his right to request an "investigation" of the arrearage if he deems the certification inaccurate or improper. If an investigation was requested, the administrator was to conduct an investigation into the accuracy of the reported arrearage. If he found the certification to be in error, there could be no intercept; otherwise the Comptroller was to intercept the tax refund of the obligor, once the obligor became entitled to one. Significantly, the investigation was to be put on record, with the report of the investigation made available to the obligor-parent within thirty days from the date of objection. Then, within fifteen days of the intercept, the Comptroller had to notify the obligor that the intercept had occurred, as well as of his right to appeal such intercept and of the method for doing so. At the appeal, an obligor was entitled to an administrative hearing before an impartial review officer, with the right to have a record made of the proceedings, to be represented by counsel, to offer testimony, to present witnesses, and to submit oral argument. From an adverse decision of the administrative law judge, the obligor had the right to judicial review. *McClelland,* 786 F.2d at 1207.

The Court held that this combination of pre-intercept investigation on the record with an immediate post-intercept plenary hearing, followed by judicial review, afforded all obligors their federal due process rights. This conclusion, the Court reasoned, was consistent with the Supreme Court's analysis of due process in *Mathews v. Eldridge* and *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). In *Loudermill,* a state employee who could be fired only for cause was fired without a full pre-termination hearing. The Court held that, in light of the competing interests involved, it was constitutionally necessary and sufficient to provide an employee with a pre-termination "opportunity to respond

to charges" (consisting of notice of the charges, an explanation of the employer's evidence, and an opportunity to present the employee's side of the story), coupled with a full post-termination hearing. 105 S.Ct. at 1495–96. By a similar analysis the *McClelland* court evidently felt that a pre-intercept, recorded "investigation" plus the full post-intercept hearing and judicial review satisfied the state's obligation to provide support obligors with procedural due process.

Although neither party to this case observes the point, the cases of *Nelson, Marcello,* and *McClelland* all involved family support obligors whose obligations had been court-adjudicated some time before the states sought to intercept their tax refunds.[3] Thus, the obligors were essentially post-judgment debtors who sought vindication of their procedural due process rights. At one time the Supreme Court seemed to suggest that post-judgment debtors had no due process rights prior to execution of judgment, see *Endicott-Johnson Corp. v. Encyclopedia Press, Inc.,* 266 U.S. 285, 45 S.Ct. 61, 69 L.Ed. 288 (1924). Notwithstanding *Endicott,* in recent years many post-judgment remedies have been successfully challenged under the due process clause on the theory that *Endicott* never considered the possibility of defenses to the execution of a judgment on particular property at the particular time execution is sought. *See, e.g., Griffin v. Griffin,* 327 U.S. 220, 66 S.Ct. 556, 90 L.Ed. 635 (1946) (judgment directing the execution on an alimony debt violated due process because issued ex parte and had cut off defense available to the husband); *Finberg v. Sullivan,* 634 F.2d 50 (3d Cir. 1980); *Community Thrift Club, Inc. v. Dearborn Acceptance Corp.,* 487 F.Supp. 877 (N.D.Ill.1980) (Illinois wage garnishment unconstitutional).

The modern view is that due process does apply to post-judgment remedies. See

**3.** *See, e.g., McClelland,* 786 F.2d at 1207 (interception applies to "court-obligated child support payments"); *Marcello,* 574 F.Supp. at 588 & n. 3 (tax refund interception triggered when there is a "past-due support" obligation, where the obligation has been "determined under a court order, or an order of an administrative process").

cases found at *McCahey v. L.P. Investors*, 774 F.2d 543, 547 n. 5 (2d Cir.1985). However, the *Mathews v. Eldridge* balancing test, which always informs a due process inquiry, often dictates that post-judgment debtors are entitled to fewer procedural trappings before execution than are pre-judgment debtors. *See, e.g., McCahey*, 774 F.2d at 549–50 (post-judgment debtors have no right to a pre-seizure hearing; only right to notice of seizure and prompt post-seizure hearing to assert exemptions); *Finberg*, 634 F.2d at 59–62 (post-judgment seizure must be followed by prompt notice of possible exemptions and hearing, but no right to pre-seizure hearing); *Jahn v. Regan*, 584 F.Supp. 399 (E.D.Mich.1984) (post-judgment debtor entitled to procedural safeguards after a refund interception, not before; however, a debtor against whom a judgment has not yet been entered is entitled to greater safeguards prior to the refund interception). The reduction in procedural safeguards for post-judgment debtors is often appropriate because there are generally fewer defenses to the execution of a judgment than there are to the existence of an underlying debt. Thus, for post-judgment debtors, there is less likelihood that seizure would be erroneous and there is a greater risk that eligible property will be wrongfully concealed. Consequently, it is understandable that courts are often reluctant to afford post-judgment debtors with pre-seizure hearings.

Nevertheless, the courts in *Nelson, Marcello*, and even *McClelland* all held that in light of the competing interests involved, court-obligated support obligors were entitled to some *pre*-intercept opportunity to be heard. (Of course, the "opportunities" mandated by *Nelson* and *Marcello* were more extensive than those mandated in *McClelland;* this may be because of the prompt, plenary post-intercept hearing guaranteed in *McClelland*.) These courts approved pre-intercept procedural safeguards, notwithstanding the existence of a prior court-ordered obligation, for two possible reasons. First, tax refunds are heavily relied upon and therefore represent an usually strong property interest. Second,

unlike the usual post-judgment execution, the tax refund interception could occur at a time that is unrelated to the date on which the underlying support obligations were originally adjudicated. As a result, there is a greater likelihood of an erroneous interception through arrearage miscalculation. These factors contributed to the need of providing certain procedural safeguards amounting to "an opportunity to present [an obligor's] side of the story," *Loudermill*, 105 S.Ct. at 1495, *prior* to the interception.

## B. Application of Due Process Requirements to this Case

Construing the evidence in this case in defendant's favor, plaintiff received three identical letters, dated December 7, 1984, April 22, 1985, and January 6, 1986. Each letter was brief and simply announced to plaintiff that his account on his student loan was seriously past due, and as a result, the state had the right, if it chose to exercise it, to offset an appropriate portion of his paycheck. The only mechanism stated in the letter by which plaintiff could "prevent initiation of the offset procedure" was to "remit the entire past due amount immediately." This was the sum total of plaintiff's predeprivation notice and opportunity to be heard.

█ Without question, such notice is not due process. No mention is made of any possible mechanism for challenging the existence, accuracy or current collectibility of the claimed deficiency. No phone number is listed for obtaining further information. This notice, under all the previously discussed applicable law, is not constitutionally meaningful and therefore falls short of due process.

Separate from the issue of notice is the issue of an opportunity to be heard on the accuracy of the claimed deficiency. Plaintiff was given no such opportunity prior to the deprivation. Indeed, he was not even told of a phone number for directing a protest. Such informal "telephone" process was present in *Marcello*, but even this

was constitutionally deficient. Plaintiff simply received three letters on the above noted dates, and then on April 11, 1986 the offset occurred. This is not simply a case of an absence of a meaningful opportunity to be heard. There was literally no opportunity to be heard.

■ Defendant has two responses. First, defendant suggests that since plaintiff, in response to the first letter of January 11, 1984, negotiated a new payment schedule, he must have known he had an opportunity to communicate his grievances with a state officer prior to a deprivation. Moreover, by virtue of the fact that the letter of intent to request an offset was issued on January 6, 1986, that the actual offset was not requested until February 13, 1986, and that the offset itself did not occur until April 12, 1986, plaintiff had "time" to raise any objections and therefore had an "opportunity" to be heard. All this is unpersuasive. First, the January 11, 1984 letter was substantially more informative than the three subsequent form letters plaintiff received. Most significantly, that letter contained a toll-free number for plaintiff to call to discuss the proposed offset. Plaintiff evidently did call this number since he was put on a new payment schedule and no offset was made. When plaintiff received the next three letters, no phone number was listed. Furthermore, the "time" between the letter of intent to request an offset and the offset itself afforded plaintiff no real opportunity to contest the proposed offset. During this period of time, plaintiff was told nothing of *when* the offset was scheduled to take place or *how* he could proceed to protest the propriety of it. Thus, in no way can the mere lapse of time between the letter of intent and the offset be regarded as a constitutionally meaningful opportunity to be heard.

■ In any event, defendant's argument assumes that the "process" of the opportunity of a phone call is constitutionally adequate. This notion was firmly rejected in *Marcello*. Such "process" denied plaintiff an opportunity to appear personally, present evidence, obtain a written decision, and create a record for later review. Thus, even if plaintiff should have known which number to call, due process was still violated.

Defendant's second response is that plaintiff was afforded an adequate post-deprivation remedy. On April 16, 1986, plaintiff received a letter from defendant, mailed on April 12, 1986, which notified him that part of his wages had just been withheld, the amount of the withholding, and who to contact if the plaintiff disagreed with the withholding. The letter provided an address to file written objections and any supporting documents. If no protest was received within thirty days, the withheld amount would be sent to the agency which requested the offset.

■ Such process still falls short of due process. First, plaintiff was temporarily deprived of his wages for at least the time it takes for the defendant to receive a protest and unilaterally determine the correctness of the withholding. Wages, of course, are a vitally important and expected source of property. They are at least as important as anticipated tax refunds. As the case law makes clear, even temporary deprivations of this or any sort of property triggers the due process guarantee and one feature of this guarantee is that post-deprivation hearings are the exception. They are unconstitutional unless some strong justification for the delayed process is presented. Defendant here offers none. There is no emergency necessitating a belated hearing. A predeprivation hearing is not impracticable in the sense that the state cannot predict when a deprivation will occur. Defendant deprived plaintiff of his wages in a manner authorized by the state statute and regulations. This, therefore, is not a case like *Hudson v. Palmer*, where the defendant's deprivation of plaintiff's property was not pursuant to established state procedures and therefore could not have been reasonably predicted. Unlike *Mathews v. Eldridge*, the predeprivation process contains no substantial indicia of reliability since literally no predeprivation

opportunity to respond to charges now exists. Finally, plaintiff is *not* a post-judgment debtor. His debt to the ISSC has never been court-adjudicated. He therefore has never even had an opportunity to contest the validity of or raise the relevant defenses to the underlying debt. But even if his debt had been court-adjudicated, *Nelson* and *Marcello* both teach that he and other members of the first subclass are still entitled to an extensive pre-withholding opportunity to object to the claim of debt. Even *McClelland* held that an obligor is entitled to a pre-intercept "investigation" of indebtedness, and that is acceptable only when followed by a prompt, post-intercept plenary hearing. The post-withholding process here is not a plenary hearing of any kind, and there was no pre-withholding "investigation" which plaintiff had the right to demand. Thus, there being no justification for delayed process, the post-deprivation process here is constitutionally inadequate.

Second, even if the post-deprivation proceedings that plaintiff was provided here occurred prior to the withholding (and assuming no additional post-deprivation process were provided), due process would still have been violated. The post-deprivation "proceeding" described in the letter does not afford the plaintiff an opportunity to appear personally. Also, as the statute and regulations indicate, there is no requirement that a record of the written protest be kept, and apparently none was. There is and was no opportunity for any sort of judicial review. Thus, the post-deprivation process, even if it were to predate the withholding, falls short of the Constitution.

The court reaches these conclusions only after applying each of the three *Mathews* factors to the facts of this case. Specifically, in applying the first prong of the test, the court finds the private interest here to be substantial. As to plaintiff himself, his substantial interest in the uninterrupted flow of his state paycheck cannot be seriously questioned. All wage earners plan and budget around the expected arrival of a paycheck. Erroneous withholdings of even part of that check can work significant direct and collateral hardships on the wage earner. The same is true for the entire class. Although the class consists of all people who are entitled to warrants against the state treasury, and this includes more than just state employees, all such warrants represent funds which the warrant-holder will come to rely on and expect. To withhold full payment on these warrants without properly ensuring the correctness of the withholding can cause significant hardship.

The government interest is also important. There is the legitimate interest of the government in collecting on its past-due debts. However, at no point does the defendant explain why it is necessary for the state to withhold the funds *prior* to a hearing on the propriety of the withholding. If withholding were delayed until after a hearing, there is no danger (at least none is articulated) that the state will be unable to collect funds from plaintiff's future paychecks. Presumably, plaintiff will not quit his job in order to avoid the vulnerability of being a state employee, since this would jeoparidze his flow of income even more radically than a withholding. Indeed, if the possibility of state employees quitting their jobs is really a problem, it already exists. Plaintiff and class members are presently given advanced warning of a proposed withholding well before the withholding occurs.

In any event, as to all warrant holders, the risk to the government in providing the hearing before the withholding can be minimized to acceptable levels. As *Marcello* observed, "the procedural steps needed to eradicate the taint of unconstitutionality could, in all probability, given a reasonable degree of effort and efficiency on the State's part, be completed before the time that the [government] would normally refund or transfer overpayments." *Marcello v. Regan*, 574 F.Supp. at 597. Similarly, in this case the government could arrange for its hearing on the correctness of the proposed offset to occur at some point prior to the time that, in the ordinary course of

state business, the targeted payment is placed in the possession of the wage earner or other warrant holder. Defendant here offers no suggestion as to why this arrangement might be infeasible. Indeed, in this case the government initiated plaintiff's April 12, 1986 offset at least as early as January 6, 1986 and possibly as early as December 7, 1984, when the letters of intent to request an offset were mailed to plaintiff. Surely then, the government has the practical ability to allow enough time for plaintiff to personally appear and present objections to proposed offsets. Defendant raises no suggestion as to why this would not be true for warrant holders in general.

Of course, pre-withholding procedural safeguards would impose an administrative burden on the state, especially since the state currently offers only the most minimal opportunity to be heard on the correctness of the withholding, and even this opportunity occurs only after the withholding. However, as *Nelson* observed:

> An announced administrative procedure with judicial review, where individuals may challenge the refund offset and present defenses, however, need not impose a great burden. The administrative procedure may take the form of an opportunity to submit documents which support the complainant's claim along with an opportunity to discuss the matter with an official. The hearing officer should submit a short statement of the reasons for the decision reached. Judicial review may be confined to the record.

*Nelson v. Regan*, 560 F.Supp. at 1108.

These additional procedural safeguards would markedly decrease the likelihood of an erroneous deprivation, and for this additional reason they are mandated by due process. Currently, the risk of erroneous deprivation is high. For plaintiff and other class members whose underlying debt has never been liquidated by a court judgment, there may be numerous legal defenses to the existence of the debt that have never been heard by a neutral officer and might alter the size or existence of the debt. Even as to those class members whose debts have been reduced to court judgments, there may still be defenses to the *current collectibility* of the arrearage in the amount that the state believes is owing. Thus, cases of mistaken identity, incorrect debt computations, or debt uncollectibility due to bankruptcy will likely not be recognized prior to the withholding.

Indeed, in plaintiff's case, the evidence before the court suggests that an erroneous deprivation occurred. Plaintiff filed for bankruptcy prior to the date on which the defendant withheld plaintiff's wages. The bankruptcy petition included plaintiff's student loan debt. On the date the petition was filed, the provisions of the automatic stay provision invoking a stay of all collection efforts of covered debts went into effect. See 11 U.S.C. § 362. Thus, it could reasonably be argued that any attempt to collect the debt at issue after the date of bankruptcy filing (April 1, 1986) from plaintiff's wages was contrary to federal law. Had there been an appropriate procedure to contest the withholding before it occurred, the plaintiff could have informed the defendant of the fact of his bankruptcy and thus deservedly retained possession of his property. In short, not only does the complete absence of a pre-withholding hearing render the likelihood of erroneous deprivation great, in plaintiff's case the deprivation was in fact erroneous.

 In summary then, plaintiff and class members receive constitutionally inadequate due process. Prior to the withholding, all they receive is a notice that a proposed withholding will likely occur. The notice literally announces nothing more than this virtual foregone conclusion. Should they have any defenses to the underlying debt or the current collectibility of the debt, they are told of and given no procedure for raising their defenses on the record before an officer before the withholding occurs. After the withholding, they may file written objections, but have no right to make a personal appearance, examine the state's evidence, produce a

record and obtain judicial review. As to plaintiff and the class members who have never had their debts adjudicated by a court, this process falls far short of due process. As to these individuals, federal due process commands that *prior* to the withholding of funds, they must receive notice of the proposed withholding *and* the opportunity personally to appear before a neutral state officer to present defenses to the underlying debt and contest current collectibility of the debt. The proceeding must permit them to present evidence and the state's evidence must be available to them. The state officer must be empowered to decide the correctness of the current collectibility of the debt. The proceedings before the officer and the decision must be on the record. Judicial review may be confined to the record and may occur after the withholding.

As to those class members whose underlying debts have been previously determined by a court judgment, less extensive pre-withholding process is acceptable. Since the defenses to the underlying debt have already been heard and decided, there is less risk of an erroneous withholding. Nevertheless, as is implicit in cases like *Nelson* and *Marcello*, since there are defenses to the current collectibility of the claimed arrearage, i.e., mistaken identity, mistaken calculations, bankruptcy, these debtors must still be given some pre-withholding opportunity to present into a record written objections to the state's evidence for withholding and receive a decision from an impartial officer. If no more extensive process than this is provided, then *Loudermill* demands that this streamlined pre-withholding process be supplemented by a prompt, plenary post-withholding hearing followed by the availability of judicial review.

▆▆ The court can now assess the facial validity of the Illinois statute and regulations. The only provision under the regulations for an opportunity to challenge the indebtedness is found in Ill.Admin.Code tit. 74, § 285.1104. That section states that upon processing a claim for withholding,

the Comptroller shall, "as soon as practicable," give notice to the warrant holder of the request for withholding and of an opportunity to make a written protest of the withholding within thirty days. Evidently, in plaintiff's case, the "as soon as practicable" rule translated into "after the offset occurred." As discussed earlier, this post-withholding process was constitutionally inadequate. This part of the regulation is, however, susceptible of other interpretations. In fact, it appears to be the only part containing a reasonable ambiguity of meaning.

Nevertheless, even if Illinois courts were to interpret the phrase "as soon as practicable" to mean "before an offset occurs," the process provided by these regulations would still fall short of due process. Regardless of when the "notice" and "opportunity for protest" provided in the regulations occurs, the regulations still fail to give the warrant holder a right to see the State's evidence. There is no provision for the proceedings to be placed on any record. No written decision is guaranteed. There is no right to judicial review after the withholding occurs. And for those class members, like plaintiff, who have not yet had their debt obligation court adjudicated and for whom a personal appearance may be critically important, there is the additional problem that no right to personally present one's objections is provided. These are all due process deficiencies that no reasonable interpretation of the regulations will save. Consequently, the statute is unconstitutional on its face as well as applied to plaintiff.

*Conclusion*

Plaintiff's motion for summary judgment is granted. Ill.Rev.Stat. ch. 15, § 210.05 and the implementing regulations are declared unconstitutional as applied to plaintiff and on their face. Defendant is permanently enjoined from implementing those laws in a manner inconsistent with this opinion's explanation of due process. Plaintiff's motions for preliminary injunction and waiver of security are denied as moot. Plaintiff's motion for class certifica-

tion is granted. Defendant's motion for abstention is denied. This ruling disposes of all matters in this case.

It is so ordered.

## APPENDIX A

The January 6, 1986 notice of intent had the following form:

Past Due _____

Dear

You have been given many opportunities to pay your defaulted student loan, but your account is seriously past due. Because you are a State employee, the State Comptroller's Office may offset your entire paycheck, or a portion thereof, to make the payments against your debt to the State, per the *Illinois Revised Statutes*, Chapter 15, Paragraph 210.05.

If we choose to offset any portion of your paycheck, you will not receive your check on payday but will have to wait for a replacement warrant to be issued for the balance of wages due to you. This process could delay your check from five to ten days.

In order to prevent initiation of the offset procedure, it is necessary that you remit the entire past due amount immediately.

## APPENDIX B

The January 11, 1984 notice of intent had the following form:

Dear Mr. Toney:

We have afforded you many opportunities to liquidate your Illinois Guaranteed Loan.

Since you are a State Employee, we may, if we so choose, request offset of your entire paycheck, or a portion thereof, through the State Comptrollers Office. This is stated in Illinois Revised Statutes 1973, Chapter 15, Paragraph 210.05, Section 1005 of the State Comptrollers Act which authorizes offsetting State Employees Funds.

Also be advised, that should we offset any amount, you will not receive your check on payday, but you will have to wait for a replacement warrant to be issued for the

balance of the money due. This process could delay your check from 5 to 10 days.

Please feel free to discuss this with your supervisor or with me at 1-800-942-5804.

It is necessary that you remit at least $270.00 within five days or we will inititate action.

The decision is yours, consider it carefully.

## APPENDIX C

The Letter in relevant part is as follows:

Re: Payment Withholding for IL ST Scholarship Commission ...

The above stated agency has advised this office that you owe money for default on student loan.

Illinois Law (Ill.Rev.Stat., Ch. 15, Para. 210.05 and 210.05A) demands that, in such an instance, the comptroller withhold all payments until the full amount has been withheld. Therefore, we have withheld $280.00 from your check; the excess, if any is enclosed.

Should you requre more information in regard to this claim, please write:

IL ST Scholarship Commission
Default Collection Dept.
Box 235
Deerfield IL 60015
Phone: (312) 945-5864

If you do not agree that you owe this money, write the office of the comptroller immediately, and attach any documents or receipts that you believe support your protest Please include your social security number on all correspondence. If you do not protest within 30 days, the withheld amount will be sent to the agency stated above.

Office of the Comptroller
Accounting Operations