AMOCO PRODUCTION CO.,
et al., Plaintiffs,

v.

Thomas A. FRY, et al., Defendants.

Civ. A. No. 93–2163.

United States District Court,
D. Columbia.

Dec. 8, 1995.

L. Poe Leggette, Jackson & Kelly, Washington, D.C., for Plaintiffs.

Michael Reed, U.S. Department of Justice, Environmental & Natural Resources Div., General Litigation Section, Washington, D.C., Lisa K. Hemmer, Trial Attorney on Behalf of U.S. Department of Justice, Washington, D.C., for Defendants.

## MEMORANDUM OPINION AND ORDER

LAMBERTH, District Judge.

This matter comes before the court on plaintiff's motion to alter or amend this court's October 12, 1995, memorandum opinion and accompanying order granting defendants' motion for summary judgment. *See Amoco Production Co. v. Fry*, 904 F.Supp. 3 (D.D.C.1995). The culmination of several years of litigation, this court's opinion finally resolved a myriad of constitutional and statutory claims that plaintiffs, major oil and gas corporations, raised in an effort to prevent the defendants, primarily the Minerals Management Service ("MMS"), from withholding overpaid royalty payments on various mineral leases.

Ultimately, this court refused to force the government of the United States to allow the plaintiffs to take credits on overpaid lease royalties while these same plaintiffs refused to pay prior debts on some of the same and other leases administered by the MMS. Plaintiffs persist in complaining that the MMS has acted contrary to their statutory, common law, and constitutional rights, and they now ask the court to alter or amend its previous opinion by either granting their motion for summary judgment or at least denying the defendants' motion. Plaintiffs' latest volley of legal arguments fail now, as they did before, to convince this court that plaintiffs are entitled to an immediate return of their overpaid royalties. Accordingly, the court shall deny plaintiffs' motion to alter or amend the judgment in all respects except that, for the reasons discussed below, the court will vacate the judgment as moot with respect to one of the plaintiffs, Mobil Exploration & Producing U.S., Inc. ("MEPUS").

## I.

### BACKGROUND

In its opinion dated October 12, 1995, this court granted defendants' motion for summary judgment, finding that the defendants are entitled to withhold plaintiffs' overpaid lease royalties for possible offset of prior underpaid royalties on leases owed by the plaintiffs to the defendants. Plaintiffs, major oil companies who pay monthly mineral royalties to the federal government under oil and gas leases, brought this suit against the administrators of the leases, the MMS, when it began withholding excess royalties paid by the plaintiffs because of underpaid royalties from previous years on some of the same and other leases. The MMS intends to use these credits to offset the prior debts in the event that a direct collection action is time-barred. All of the plaintiffs have raised the statute of

limitations as a defense to the MMS' collection of the prior, unpaid royalties in various suits filed across the country; some plaintiffs also challenge the merits of the MMS' claims. In this action, plaintiffs raised a variety of statutory, common law, and constitutional claims that they believed entitled them to take an immediate credit on the overpayment in spite of the alleged prior debts.

Rejecting their arguments, the court found that the MMS could withhold the credits on overpaid royalties pending the outcome of the numerous legal challenges raised by each plaintiff to the payment of the prior debts.

In its opinion, the court specifically found that the Outer Continental Shelf Lands Act, 43 U.S.C.A. §§ 1331–56 (1986 & West Supp. 1995), the statute under which the MMS administers the Outer Continental Shelf (offshore) leases, does not force the MMS to allow the plaintiffs to take an immediate credit on royalty overpayment. Next, the court found that neither the Debt Collection Act, 31 U.S.C.A. § 3716 (1983), nor common law offset principles prevented the MMS from withholding the credits. Finally, the court found that plaintiffs did not have a sufficient property interest in the withheld royalty overpayment to invoke the protection of the due process clause. In light of these findings, the court granted the defendants' motion for summary judgment, thereby allowing the MMS to withhold the royalty credits for potential offset of the prior debts.

Plaintiffs have now moved for reconsideration of the court's prior opinion. First, plaintiffs MEPUS and Marathon Oil Company ("Marathon") ask the court to vacate its judgment as it pertains to them on the grounds that their claims became moot before the court entered its judgment. Second, the remaining plaintiffs ask the court to alter its judgment by entering summary judgment in their favor.

## II.

### ANALYSIS

Plaintiffs ask the court to reconsider several aspects of its October 12, 1995, opinion and order. The court shall now explore each basis for plaintiffs' motion and conclude, with the exception of vacating the judgment with respect to MEPUS, that plaintiffs have failed to show any clear errors of law that would warrant altering the court's previous decision.

### A. The Legal Standard:

■■■■■ The court treats plaintiffs' request to alter or amend the judgment as a motion under Rule 59(e) of the Federal Rules of Civil Procedure. A Rule 59(e) motion to reconsider is not simply an opportunity to reargue facts and theories upon which a court has already ruled. The motion " 'must address new evidence or errors of law or fact and cannot merely reargue previous factual and legal assertions.' " *Assassination Archives and Research Center v. United States Dept. of Justice,* 828 F.Supp. 100, 102 (D.D.C.1993) (*quoting Mississippi Ass'n of Cooperatives v. Farmers' Home Admin.,* 139 F.R.D. 542, 546 (D.D.C.1991)). A court will grant a motion to reconsider only if the moving party can present new facts or clear errors of law that "compel" a change in the court's prior ruling. *Natural Resources Defense Council, Inc. v. United States Envtl. Protection Agency,* 705 F.Supp. 698, 702 (D.D.C.1989); *see also National Trust for Historic Preservation v. Department of State,* 834 F.Supp. 453, 455 (D.D.C.1993), *aff'd in part, rev'd in part sub nom. Sheridan Kalorama Historical Ass'n v. Christopher,* 49 F.3d 750 (D.C.Cir.1995).

### B. Plaintiffs' Claims of Mootness:

Plaintiffs MEPUS and Marathon ask the court to vacate its October 12, 1995, judgment as it pertains to them and dismiss their complaints as moot. As the discussion below explains, the court also treats this request as a motion under Rule 59(e), and it shall grant MEPUS's request because a settlement reached between the MMS and MEPUS prior to the court's entry of judgment mooted MEPUS's claims. However, the court shall deny Marathon's request because the court finds that its claim remains live and ripe for decision.

### 1. *The Appropriate Legal Standard:*

The court treats MEPUS' and Marathon's request as a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). Plaintiffs argue that the court's inquiry is guided by the line of cases stemming from the Supreme Court case of *United States v. Munsingwear, Inc.,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950). This reliance on the *Munsingwear* line of cases is misplaced; these cases address the situation where a case becomes moot following the entry of judgment by the district court but while the appeal is pending before the court of appeals or the Supreme Court. To the contrary, in this case, MEPUS and Marathon argue that their claims were mooted before the district court entered its judgment. Because this allegation implicates the court's jurisdiction to have entered the judgment, the request is best analyzed under Rule 59(e).

A discussion of the latest Supreme Court case addressing the *Munsingwear* issue illustrates its inapplicability to MEPUS' and Marathon's request. In *United States Bancorp Mortgage Co. v. Bonner Mall Partnership,* the Supreme Court addressed the question of "whether appellate courts in the federal system should vacate civil judgments of subordinate courts in cases that are settled after appeal is filed or certiorari sought." —— U.S. ——, ——, ——, 115 S.Ct. 386, 388, 389, 130 L.Ed.2d 233 (1994) [hereinafter *Bancorp* ]. Following the district court's reversal of the bankruptcy court, petitioner Bancorp appealed to the Ninth Circuit. Bancorp then petitioned the Supreme Court for a writ of certiorari after the Ninth Circuit affirmed the district court. Once the Supreme Court had granted the writ and the case had been briefed, the parties settled. Bancorp then asked the Supreme Court to vacate the judgment of the court of appeals under 28 U.S.C.A. § 2106 (1994).[1]

The Supreme Court's analysis in the *Bancorp* case does not apply to a claim of mootness prior to a district court's entry of judgment. Whether Bancorp attempted to avoid the adverse judgment of the lower courts by settling the case on appeal was the key issue in *Bancorp.* Indeed the Court specifically distinguished between settlements reached before a district court enters its judgment and settlements that occur while the case is on appeal. The court found that to allow vacatur pending appeal would actually deter settlement at the earlier stage. *Id.* at ——, 115 S.Ct. at 393. In this case, the actions that allegedly mooted MEPUS' and Marathon's claims occurred prior to this court's entry of judgment. Both MEPUS and Marathon argue that if they had timely notified the court of their respective change in circumstances, the court would never have entered judgment against them. This inquiry differs in kind from questioning whether a party seeks to avoid an adverse judgment by taking actions following that judgment.[2]

Moreover, the *Bancorp* opinion held that absent extraordinary circumstances, a settlement while an appeal is pending does not entitle the parties to a vacatur of the lower court's decision. The court found, in part, that by settling, the party that lost in the lower court voluntarily forfeits its right to the legal remedy of an appeal. *Id.* at ——, 115 S.Ct. at 392. The Court found that in so doing, the party also surrenders its right to the legal remedy of vacatur. *Id.* This rationale is also inapplicable to this case. Here, the question for the court is whether at the time it entered judgment, a live controversy existed that would entitle the court to render a judgment on the parties' claims. MEPUS and Marathon, while they are certainly attempting to avoid an adverse judgment, premise their claim upon events occurring before the court entered its judgment.

---

**1.** This statute establishes the power of vacatur:
 The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.
 28 U.S.C.A. § 2106.

**2.** To be sure, Marathon seeks to avoid this adverse judgment. However, the grounds for avoiding the judgment lie in conduct occurring prior to the entry of the judgment.

■ Finally, the court properly analyzes the request to vacate under Rule 59(e). In this circuit, Rule 59(e) includes a motion to vacate a judgment filed within ten days of the court's entry of judgment. *See Moy v. Howard Univ.*, 843 F.2d 1504, 1505–06 (D.C.Cir.1988); *Richardson v. National Railroad Passenger Corp.*, 49 F.3d 760, 763 n. 2 (D.C.Cir.1995).[3]

With the proper inquiry established, the court now turns to both MEPUS and Marathon's request to vacate the judgment.

### 2. The Court Will Not Vacate Its Judgment With Respect To Marathon:

Although the decision to alter or amend a judgment under Rule 59(e) is typically within the sound discretion of the court, see, for example, *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir.1993), the grounds that Marathon alleges for vacating the judgment implicate the court's jurisdiction; therefore, this allegation requires careful scrutiny to ensure that this court had jurisdiction to enter its October 12, 1995, judgment with respect to Marathon. After considering Marathon's allegations, the court finds that Marathon's claims are not moot, and its motion to vacate the judgment shall be denied.

■ Marathon alleges that prior to the court's October 12, 1995, judgment, its claims against the defendants had become moot as a result of action taken by the MMS. Marathon claims that by mid–1994, the MMS had released all of Marathon's withheld royalty overpayments, thereby mooting Marathon's claims. As justification for not bringing this to the court's attention until now, Marathon relies on the fact that its "new" in-house

counsel (employed since January of 1995) did not "become aware of the refund ... until after this Court's October 12 decision had been issued." Pls. Mot. to Alter or Amend the J. at 5. In any event, Marathon claims that the MMS has not withheld any of its credits since that refund. On these facts, Marathon contends that it is entitled to a vacatur of the judgment for mootness.

■ As the Supreme Court stated in *Flast v. Cohen*, a federal court cannot adjudicate a claim "mooted by subsequent developments...." 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968). In this circuit, in order for this court to have dismissed Marathon's claims as moot, that is, to now vacate the judgment because of mootness, two conditions must be met: (1) "the court must find that 'there is no reasonable expectation ...' that the alleged violation will recur;" and (2) "it must be clear that 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Save Our Cumberland Mountains, Inc. v. Clark*, 725 F.2d 1422, 1431–32 (D.C.Cir.1984) (citations omitted). Contrary to Marathon's contention, the court finds that the alleged violation by the defendants will inevitably recur; thus, Marathon's claims were not mooted by the defendants' actions in 1994.

Although the defendants may have released all withheld funds in 1994, Marathon has not dismissed its action challenging the defendants' assessment of back royalties on statute of limitations grounds.[4] Moreover, the defendants claim that they will withhold future royalty overpayments to ensure that if Marathon wins its statute of limitations case, the defendants will have funds to offset the

---

3. Because plaintiffs filed this motion to vacate within ten days of the court's entry of final judgment, whether the court treats the request as a motion under Rule 59(e) or Rule 60(b) is irrelevant. Prior to the 1993 amendments, the Federal Rules of Appellate Procedure allowed a valid 59(e) motion, but not a 60(b) motion, to toll the thirty day time for appeal until the court ruled on that motion. However, as the D.C. Circuit has noted, in 1993, the Rules were amended to allow a Rule 60(b) motion filed within ten days of the court's entry of judgment to toll the time for appeal as well. *See Derrington–Bey v. District of Columbia Dept. of Corrections*, 39 F.3d 1224, 1226 (D.C.Cir.1994) (citing Federal Rule of Appellate Procedure 4(a)(4)(F)).

4. In response to the defendants' claim for previous, unpaid royalties, Marathon, like all plaintiffs in this action, filed suit to prevent the defendants from collecting the back royalties on statute of limitation grounds. Marathon's statute of limitations action is *Marathon Oil Co. v. Babbit*, Civil No. A93–503 (D.Alaska). In this action, Marathon does not dispute the underlying liability for the back royalties, it argues only that the claims are time-barred.

debts found to be time-barred.[5] To this end, the defendants point to several requests for refunds submitted by Marathon that will shortly be approved by Congress under the OCSLA; defendants aver that they will withhold those credits pending the outcome of Marathon's statute of limitations case. Additionally, Marathon, along with all other plaintiffs, sought not only a return of withheld credits, but also declaratory and injunctive relief to prevent the defendants from withholding credits in the future. Because Marathon continues to assert its statute of limitations defense, the court finds that the injunctive relief sought kept the controversy live. Marathon cannot successfully argue that its claims were mooted when the defendants returned withheld credits in 1994 in light of the nature of its claims and the relief sought.

The court's finding is reinforced by Marathon's suspect conduct in this matter. By its own assertion, the defendants released the withheld credits in mid–1994. Not so coincidentally, Marathon did not argue that its claims had been mooted until after this court's judgment against it. Marathon attempts to justify this delay by claiming that its new in-house counsel did not "become aware" that the defendants had released all its withheld credits until after this ·court's October 12 judgment. Even accepting as true, which this court is not willing to do, that the previous counsel for Marathon was somehow unable to come forward and inform the court that its claims were mooted, Marathon still cannot explain why its "new" counsel responsible for this case took from January 1, 1995, until now to "become aware" that Marathon's entire claim was mooted back in 1994. The court finds that Marathon's claim of mootness is simply an attempt to avoid the court's adverse judgment. Furthermore, because the court finds that Marathon's claim is not moot, the court had jurisdiction to enter its October 12 judgment against Marathon.

The court will not vacate its judgment as it pertains to Marathon; however, the court will grant Marathon's request to join the remaining plaintiffs' motion for reconsideration.

### 3. *The Judgment Shall Be Vacated With Respect To MEPUS:*

On September 25, 1995, MEPUS and the defendants signed a global settlement of issues stemming from MEPUS' asserted statute of limitations defense and the MMS's withholding of royalty overpayment. On October 26, 1995, pursuant to MEPUS' request, Judge Harris of this court dismissed MEPUS' statute of limitations case, Civil Action Number 93–0184. Both parties agree that as part of their settlement, MEPUS should have dismissed its involvement in this case. Although the parties failed to notify the court of this settlement prior to its October 12, 1995, judgment, the court agrees with both MEPUS and the defendants that the judgment should be vacated with respect to MEPUS.

Unlike Marathon, the global settlement reached between MEPUS and the MMS had the effect of mooting MEPUS' claims prior to the court's entry of judgment. Key to distinguishing between Marathon and MEPUS is the fact that MEPUS dropped its challenge to the collection of the prior debts on statute of limitations grounds. As both parties state to the court, that dispute was resolved by the settlement. Thus, in order for the dispute to recur, the MMS would have to attempt to assess a new set of back royalties, and MEPUS would have to again assert the statute of limitations defense. On the other hand, because Marathon and the MMS did not resolve the dispute over the collection of the back royalties, the MMS will inevitably seek to withhold overpaid royalties to cover that debt so long as Marathon continues to refuse to pay on statute of limitations grounds.

Therefore, the court shall vacate its judgment with respect to MEPUS.

### C. *The Remaining Plaintiffs' Motion To Alter Or Amend The Judgment:*

The plaintiffs that remain in this action have asked the court to reconsider its grant of summary judgment in favor of the defen-

---

**5.** As the court's opinion of October 12, 1995, held, even if the statute of limitations will prevent the defendants from initiating a direct ac-

tion to collect the unpaid royalties, the defendants may still offset the debts with the withheld overpayment.

dants. The plaintiffs present no legitimate basis for the court to reconsider its decision under Rule 59(e), instead reformulating many of the same arguments previously rejected by the court. Consequently, the court shall deny this motion.

1. *Defendants Cannot Be Assured of Future Offsets:*

■ As they did in their motion for summary judgment, plaintiffs again argue that there is no need for defendants to withhold credits now because "defendants enjoy an ever-replenished source of funds to offset [the] claims" in the future. Pl.Mot. to Alter or Amend the J. at 7–8. In other words, plaintiffs argue that because they typically overpay royalties each year, defendants can wait until all disputes over the debts are resolved and then withhold current credits for offset. First, in this Rule 59(e) motion, plaintiffs fail to point out any errors of law and merely reurge their previous argument. On this basis alone the court can deny their motion. *See Natural Resources Defense Council, Inc.,* 705 F.Supp. at 702. Second, this assertion that the plaintiffs will "probably" overpay in the future cannot provide a basis for guaranteeing defendants that sufficient funds will be available to offset the debts. Whether or not the plaintiffs overpay future royalties is beyond the control of the defendants. The court cannot base its holding on the plaintiffs' assurance that they will likely overpay in the future. To the contrary, plaintiffs certainly would have a strong incentive not to overpay their royalties if they are successful in their statute of limitations defense. Absent a guarantee by the plaintiffs of sufficient overpayment, the court will not alter its finding that compelling the MMS to release the credits may prevent future offset.

2. *The MMS Can Require Written Permission Before Plaintiffs May Take A Credit On Overpaid Royalties:*

In its previous opinion, the court found not only that the MMS could require the plain-

tiffs to await written permission from the MMS before taking a credit on royalty overpayment, but the MMS could also withhold that permission and retain the overpayments for future offset of the debts. In arriving at this conclusion, the court first found that the OCSLA was silent as to whether the MMS could add the additional requirement that a lessee must have written permission before taking credits on overpaid royalties. Thus, under the Supreme Court case of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), the court deferred to the MMS' interpretation of the statute as reasonable.[6] Next, the court found that the MMS' interpretation was permissible, even though, as plaintiffs charged, the MMS did not conduct a formal or informal rule-making before beginning to use that procedure.

Once the court determined that the MMS could require that a lessee await written permission from the MMS before taking a credit, the court addressed plaintiffs' argument that under the OCSLA, even if the MMS can require written permission, the MMS has a duty to grant that permission as soon as the overpayments are verified. The court conducted its own evaluation of the OCSLA and found that if the plaintiffs' argument were true, it would effectively abrogate the MMS' common law right to offset. Because the court found nothing in the OCSLA that purported to abrogate that right, the court held that the MMS' common law right of offset survived the enactment of the OCSLA. Therefore, the plaintiffs could not construe the terms of the OCSLA to require that the MMS issue written permission in derogation of the MMS' common law offset right.

In the instant motion, plaintiffs take the court's analysis and attempt to create in themselves a competing common law right of

---

**6.** The court also rejected plaintiffs' argument that because plaintiffs are allowed to unilaterally take a credit on onshore leases, they should also be allowed to unilaterally take a credit on offshore leases. The court held that, unlike onshore leas-

es, the OCSLA expressly prescribed additional steps before a credit can be taken on offshore leases (although OCSLA did not, of course, require the MMS' written permission), and thus plaintiffs could not simply equate the two.

"offset" that would overcome the MMS' own offset right. First, plaintiffs argue that they, like the MMS, have a common law right of offset. Apparently, plaintiffs define this right to be a common law right to take credits on lease overpayments by unilaterally applying them to the next year's lease payment. They contend that unless the court finds that the OCSLA expressly abrogates that right, the right must remain.[7] Therefore, because the court did not, and plaintiffs argue could not, find that the OCSLA expressly abrogates their right, refusing to allow the plaintiffs to immediately take the credits is "untenable" as it violates their common law rights.

Plaintiffs then go on to hypothesize that the court ignored plaintiffs' common law offset rights as a result of improper deference to the MMS' practice of requiring the written permission of the MMS before credits can be taken. The plaintiffs believe that the court allowed the MMS to withhold permission to take credits solely by deferring to the MMS' decision to do so. The court's deference is invalid, plaintiffs aver, because the MMS cannot derogate plaintiffs' own offset rights through statutory interpretation, and the MMS Oil and Gas Payor Handbook: Report of Sale and Royalty Remittance (Form MMS–2014) (September 1986) ("Payor Handbook"), the source of the MMS' policy of requiring written permission, is not worthy of deference under *Chevron.*

Plaintiffs have argued since the inception of this case that under the OCSLA, they have a right to unilaterally take a credit on overpaid royalties following the congressional report-and-wait period. *See* Mem.Op. at 2–3. Although couched in different terms, this motion for reconsideration advances the very same argument. The answer to plaintiffs' latest motion lies in exposing their erroneous premise.

The plaintiffs convolute the two distinct holdings of the court: First, the court found that requiring written permission before a lessee may take a credit under the OCSLA was valid; and second, the court found that the MMS may withhold that permission in order to offset prior debts of the lessee. The court analyzed the MMS' adoption of the written permission requirement independent of whether the MMS could then withhold that permission to preserve its offset rights. It was in this first context that the court deferred to the MMS' policy of requiring written permission, a policy that has been in place for at least eight years.[8] The court then addressed the second issue raised by the plaintiffs, that is, whether the MMS could withhold that permission in order to preserve its offset rights. Plaintiffs, however, meld the two holdings and allege that the court also deferred to the MMS' interpretation that it could withhold the credits for offset. This is simply inaccurate. The court evaluated the withholding issue without any deference

7. Plaintiffs cite to the case of *United States v. Texas*, 507 U.S. 529, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993). The court relied upon that case for the proposition that a common law right survives the enactment of legislation unless the statute or the legislative history expresses an intent to abrogate that right. *Id.* at 532–37, 113 S.Ct. at 1634–36.

8. Plaintiffs contend that the court's deference to the Payor Handbook is improper as the Handbook is not, under *Chevron,* worthy of deference. First, because the court shall reject plaintiffs' overall claim that this court relied on the Handbook to defer to the MMS' interpretation of whether it could withhold written permission to preserve its offset rights, plaintiffs' claim against the Handbook itself loses its significance.

Second, the court also finds that plaintiffs' argument is inaccurate. On the single issue of whether the MMS can require lessees to wait

until the MMS gives them written permission before taking a credit on overpaid royalties, plaintiffs ignore the fact that the MMS has had such a requirement for at least the past eight years. The plaintiffs also ignore the court's analysis of this issue in its prior opinion wherein the court found that neither a formal nor an informal rule-making was necessary for the MMS to begin using that procedure. Thus, plaintiffs' citation to the Seventh Circuit case of *Atchison, Topeka and Santa Fe Ry. Co. v. Pena*, 44 F.3d 437, 442–42 (7th Cir.1994), makes little difference to the court's holding because no rule-making was necessary.

Also, the Payor Handbook, contrary to plaintiffs' contentions, is a two-volume policy guide for lessees. The Handbook is not, as plaintiffs contend, simply a letter explaining the position of the MMS's Associate Director for Royalty Management. Therefore, plaintiffs' argument that the court improperly deferred to the Handbook shall be rejected.

to the MMS' belief that they could withhold the credits for offset. Therefore, the plaintiffs' premise that the court deferred to the MMS' interpretation on the withholding issue is wrong.

█ Moreover, even if plaintiffs correctly state that they have some sort of common law right to immediately take a credit on overpaid royalties, the court finds that the MMS' offset rights arose first and cannot be overcome by plaintiffs' later right. It makes little sense to proclaim that the MMS has an offset right if that right is always subject to a debtor's right to take a credit on recent overpayment. For example, suppose a lessee refused to pay its 1994 royalties. When the lessee overpays in 1995, under the plaintiffs' logic, the lessee's right to take an immediate credit would overcome the MMS' right to offset the 1994 debt with the overpayment. This result cannot stand.

Therefore, the court shall reject plaintiffs' recent allegations and deny their motion to alter the judgment on this issue.

3. *The DCA Did Not Supplant Defendants' Common Law Right Of Offset:*

Disagreeing with the court's conclusion that the Debt Collection Act of 1982, 31 U.S.C.A. § 3716 (1983), did not abrogate defendants' common law right of offset, plaintiffs now argue that the court (1) failed to address the Federal Claims Collections Standards, 4 C.F.R. Part 102, (2) failed to ask the proper question of whether the Act speaks directly to the collection of royalties by offset, and (3) ignored the other purpose of the Act, namely to provide procedural protections for debtors. Upon a closer examination of these allegations, however, the court concludes that plaintiffs have not shown any clear errors of law in the court's previous analysis, and these "new" allegations are little more than a new spin on their old arguments.

Plaintiffs begin by alleging that the court ignored the preamble to the Federal Claims Collection Standards when it concluded that the DCA did not abrogate defendants' common law offset rights.[9] However, in their reply memorandum, plaintiffs also attempt to convince the court that it must follow the Collection Standards which plaintiffs argue would require that the defendants comply with the DCA.[10] Such an assertion defies the notion that the administrative regulations were promulgated under the authority of and interpreting the Debt Collection Act. Indeed the preamble to the regulations indicates that the standards are construing the DCA and the degree of its coverage. *See* 49 Fed. Reg. at 8891. In approaching this issue in its prior opinion, the court, relying on the inquiry conducted by the Supreme Court when it analyzed the DCA and its impact on the common law, determined that the better view of the DCA is that it does not supplant the defendants' common law right of offset.[11]

**9.** The preamble to the Collection Standards as they pertain to administrative offset are found in the Federal Register, 49 Fed.Reg. 8889 (1984). The relevant part of the preamble is as follows:

Offset is not a creature of the Debt Collection Act.... However, the Debt Collection Act prescribed certain procedural safeguards and procedures for all agencies exercising these rights in situations which were not otherwise exempted from the Act or covered by some other legislative authority.

Non–Federal commenters argued that the [DCA] totally preempts common law, and the exemptions therefore amount to prohibitions. Several Federal agencies argued the opposite position. It has been well-established by the courts that a statute should not be construed in derogation of the common law unless legislative intent to do that is clear. There is no indication anywhere in the legislative history that the Debt Collection Act was intended to abrogate the Government's common law right

to offset. Accordingly, we construe the [DCA] as supplanting the common law only to the extent of its coverage, and the regulation adopts the position of the Federal agencies....
49 Fed.Reg. at 8889, 8891.

**10.** Plaintiffs direct the court to 4 C.F.R. § 102.3(b) which states:

(b) Except as provided ... the standards in this paragraph shall apply to the collection of debts by administrative offset under 31 U.S.C. 3716 [the DCA], some other statutory authority, or the common law.

From this plaintiffs argue that because no exemptions apply, the court is bound to require the defendants to comply with the DCA.

**11.** The court reached this conclusion using the Supreme Court's analytical framework as well as the persuasive authority of the Federal Circuit case of *Cecile Industries, Inc. v. Cheney*, 995 F.2d 1052 (Fed.Cir.1993). The court understands that

*See United States v. Texas,* 507 U.S. 529, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993). The court held that the DCA does not abrogate the defendants' common law right to offset; accordingly, regulations interpreting the DCA cannot abrogate this right.

The appropriate question, and one which plaintiffs correctly raise, is whether this court considered the position put forth in the regulations when it decided that the DCA does not abrogate defendants' common law offset right. First, the court does not believe that the position taken by the regulations in the preamble commands a different result. Moreover, the court believes that the analysis prescribed (and that which the court applied) by the 1993 Supreme Court opinion in *United States v. Texas* presents the better view of abrogation.

In support of their argument that the court ignored the preamble of the Collection Standards, the plaintiffs direct the court's attention to a pre-DCA Supreme Court opinion and argue that the court asked the wrong question in its analysis. *See City of Milwaukee v. Illinois and Michigan,* 451 U.S. 304, 315, 101 S.Ct. 1784, 1791–92, 68 L.Ed.2d 114 (1981). Plaintiffs claim that this court asked whether Congress had proscribed the use of the common law offset when it should have asked whether the "legislative scheme spoke directly to [that] question." *Id.* The court rejects this claim and directs the plaintiffs to its analysis under *United States v. Texas* in its previous opinion.

Finally, plaintiffs make one last attempt to debase the court's analysis by alleging that the court ignored the other purpose of the DCA, that is, to provide procedural safeguards to debtors before an offset is taken. That the DCA has another purpose antagonistic to the purpose of increasing debt collections of the government does not negate the latter, nor does it prevent the court from holding that common law offset is available to

the defendants. This court did not, as plaintiffs allege, construe the DCA "in light of one purpose alone." Pls. Mot. to Alter or Amend the J. at 14. The court did, however, conclude that while procedural protections for debtors is a concern, in this case, those concerns give way to the other factors in the court's analysis.

Although the plaintiffs' challenge in this action presents an interesting legal question, the court answers it now as it did in its October 12, 1995, opinion, and finds that the DCA did not abrogate defendants' common law right of offset.

*4. The Court Does Not Inappropriately Create New Common Law:*

In another attempt to obtain the return of their overpaid royalties, plaintiffs argue that the court inappropriately created new common law when it held that the MMS could withhold the funds pending the resolution of the plaintiffs' challenges to the underlying debts. The court specifically found that this act was not an offset. Plaintiffs, on the other hand, equate withholding the funds for offset with actually taking the offset. Because they are deprived of the use of the funds, plaintiffs argue, offset must have occurred.

In their motion for summary judgment, plaintiffs argued that defendants could not offset the prior debts at this time because those debts are unliquidated, contingent, and not mature as a result of the plaintiffs' legal challenges to the debts.[12] Because the court refused to agree that a debtor need only challenge the merits of the prior debt in order to prevent the creditor from offsetting the debt with funds it currently holds, the court specifically found, as other courts have impliedly found, that plaintiffs were not entitled to a return of their overpayments pending the resolution of their challenges to the debts. Crucial to plaintiffs' argument was

---

it was not, as plaintiffs ably indicate, bound by the Federal Circuit's decision, yet the fact that this court had considered virtually the identical issue meant that its reasoning should be considered.

12. Throughout this litigation, defendants have attacked the plaintiffs' allegation that offset is inappropriate because of unliquidated and contingent

debts. First, defendants point out that the reason some of the prior debts are unliquidated is because many of the plaintiffs refuse to obey the MMS' order to recalculate and pay the prior debts. Second, defendants argue that many of the debts are sum-certain as the plaintiffs only assert the statute of limitations as a defense.

their premise that the offset remedy is not available when the debt is challenged by the debtor. However, in their latest motion, plaintiffs do not mention this premise, instead arguing only that the MMS has offset their overpaid royalties in violation of the DCA's procedural protections.

The sole reason now advanced by the plaintiffs for altering the court's judgment is that the MMS offset their overpaid royalties without following the procedures of the DCA. Because the court has found that the MMS need not comply with the DCA's procedural requirements before offsetting a debt, the court shall reject plaintiffs' motion to amend the judgment on this issue.

 The court shall also reject plaintiffs' motion on the grounds that they have asserted an incorrect legal proposition. Plaintiffs argue that because they are not free to take their credits, the MMS must have already offset the debts with those credits. The court disagrees that temporarily withholding funds pending the resolution of a dispute regarding the underlying debt necessarily amounts to an administrative offset. The court fully analyzed this issue in its prior opinion, identifying and discussing what other courts simply assumed to be permissible, that a creditor could not be forced to return funds withheld for offset in the event that the debtor challenged the amount of the debt. *See Doko Farms v. United States,* 956 F.2d 1136 (Fed.Cir.1992).[13] The court will not alter this holding.

The court also finds another reason for denying the plaintiffs' motion to amend the judgment. At the summary judgment stage, the plaintiffs proceeded under the theory that the MMS could not offset the debts because those debts were unliquidated and contingent as a result of the plaintiffs' challenges to them. In response to the court's October 12 opinion, however, plaintiffs now claim that cases such as *Doko Farms* and *Tatelbaum v. United States,* 10 Cl.Ct. 207 (Cl.Ct.1986), relied on by the court in its opinion, recognized that withholding funds pending the resolution of a dispute regarding the underlying debt is itself an offset. More importantly, plaintiffs now abandon their argument that offset under these circumstances would be improper because the debts were unliquidated and contingent. If plaintiffs are correct in their revised reading of these cases, then they have successfully disproved their initial theory that offset would be improper at this time. In order to lambast the court for its reading of the *Doko* and *Tatelbaum* opinions, plaintiffs argued that cases such as these have been finding an actual offset under these circumstances for the last one hundred and fifty years. The plaintiffs cannot have it both ways. Either withholding funds for future offset is not itself an offset, or their initial premise that debts contingent because of challenges by the debtor cannot be offset must give way. The court holds, as it did before, that withholding funds pending the resolution of the debtor's challenge to the debts is not an offset.

*5. The Court's Due Process Discussion:*

In this motion, the plaintiffs have indicated that they have misunderstood the court's description of the facts regarding which leases that the MMS has withheld royalties and which leases that the plaintiffs owe unpaid royalties. In light of this misunderstanding, the court shall take a moment to restate these facts in order to prevent any further misinterpretation. The MMS administers leases on federal on- and off-shore land, as well as leases on property owned by Native Americans. Plaintiffs' debts stem from underpaid royalties on leases from each type of property. However, the MMS has only withheld royalty overpayment on *offshore leases* that fall under the OCSLA.[14]

---

**13.** In that case, even though the debtor challenged the underlying debt, the United States continued to refuse to release the debtor's overpaid funds while the challenge was pending. Because the *Doko Farms* court only presumed this to be valid, this court sought to squarely address the issue.

**14.** As discussed fully in the court's prior opinion, plaintiffs can unilaterally take a credit on overpaid royalties stemming from onshore leases; however, under the OCSLA, the plaintiffs must await the written permission of the MMS before taking a credit. Therefore, by withholding permission, the MMS can withhold the credits for offset.

Plaintiffs contend, however, that the court misunderstood the facts, and when that misunderstanding is corrected, it necessarily changes the court's due process analysis. The court disagrees. First, although the plaintiffs erroneously interpreted the language used by the court in its prior opinion, the court correctly understood the facts and analyzed the due process question accordingly. Second, to the extent that the plaintiffs use the court's language as an opportunity to disagree with the court's analysis, the court shall now reaffirm its holding and deny plaintiffs' motion to amend the judgment on this issue.

The court's due process analysis concluded that plaintiffs did not have a protected property interest in the withheld overpayments that would implicate the protections of the due process clause.[15] Plaintiffs erroneously presumed that once the MMS established that a lessee had overpaid on a lease, the lessee acquired a property interest in that overpayment. To the contrary, the court found that plaintiffs mistakenly viewed each payment on each lease as an isolated transaction. The court held that when properly viewed in the context of the ongoing relationship between a lessee and the MMS, the lessee could not be said to have a property interest in the overpayment on one lease when it owed prior debts to the MMS on the same or other mineral leases.

■ In this motion, plaintiffs argue that the court's analysis breaks down when the overpayment on one lease is held to offset the underpayment on a different lease. Because the various leases are "separate," plaintiffs argue that the court must find a property interest in the overpayment that exceeds any prior debt owed on that lease. The answer to plaintiffs' contention remains in the nature of the relationship between the plaintiffs and the MMS. The MMS administers all the mineral leases in question. The plaintiffs are all lessees of various leases. The debts as well as the overpayments stem from these leases. The MMS and the plaintiffs have several lease contracts that represent an ongoing relationship where the plaintiffs have and continue to utilize the natural resources of the federal government and Native Americans. In light of the relationship between the various leases as brought together by the MMS as the administrator or lessor combined with the continuous and ongoing relationship between the plaintiffs and the MMS, plaintiffs cannot acquire property rights in the overpayment on one lease while refusing to pay debts on the same and other leases.

Moreover, the overpayments on a lease are not overpayments that the plaintiffs are entitled to until a lessee's prior debts are satisfied. Although the MMS has determined that the plaintiffs overpaid for recent periods on the various leases, the MMS has not determined that plaintiffs are entitled to the credits in light of the prior debts. In fact, the MMS has decided just the opposite. In this sense, property rights do not inure to the lessee until the lessee satisfies the prior debts owed to the MMS on its other mineral leases.

The court's conclusion is reinforced by the cases finding a due process property interest when money in the hands of the government is appropriated to satisfy an unrelated debt. For example, courts have found property interests in tax refunds appropriated to satisfy delinquent child support payments, *Marcello v. Regan*, 574 F.Supp. 586, 595 (D.R.I. 1983), and in duly earned wages appropriated to satisfy student loans, *Toney v. Burris*, 650 F.Supp. 1227, 1234 (N.D.Ill.1986). In those cases it is clear that the debt bore no relationship to funds owing to the person. The same cannot be said about this case. Plaintiffs have numerous leases with the MMS and a continuous relationship stemming from them. Ultimately, unlike a person depending on the receipt of wages or a tax refund that suddenly finds that money usurped without process, any withholding of plaintiffs' overpayments on mineral leases stems directly from debts on mineral leases for benefits already reaped. The court will not extend those cases to this situation.

15. Moreover, the court found that the only interest at stake is the loss of the right to immediately take a credit on overpaid royalties because the MMS has not yet offset the prior debts with the overpayments.

**1004**

Finally, plaintiffs direct the court to authority indicating that the Department of the Interior's own substantive regulations prohibit offsetting the debt of one lease with the overpayment from another lease account when a lessee overpays one lease and underpays another.[16] In light of this, plaintiffs contend, the court must find that the leases are separate for the purposes of its due process analysis. The court finds plaintiffs' reliance on the MMS' substantive regulations to be misplaced.

In their complaint, plaintiffs do not allege that the MMS' failure to comply with their own substantive regulations (that is, by withholding funds for prohibited offset) entitles the plaintiffs to a return of the withheld funds. Indeed the court believes that plaintiffs could not allege such a cause of action. *See Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975).[17] Thus, if the regulations do not provide the plaintiffs with a cause of action for preventing the defendants from offsetting the debts, it does not follow that the regulations can require the court to find a property interest for the purposes of due process. Plaintiffs do not provide any authority to support their contention that an agency's regulations can provide the basis for finding a property interest under the due process clause. Moreover, the court finds that because the regulations were not promulgated to guide a due process inquiry, they cannot be used to force the court to now treat the leases as separate so as to enable the plaintiffs to find a property interest. Thus, the court holds that its constitutional inquiry under the due process clause is not controlled by the MMS' treatment of offset in its regulations.

Hence, the court reaffirms its due process analysis and finds that plaintiffs have no protected property interest in overpaid royalties withheld for offset.

## III.

## CONCLUSION

For the above-stated reasons, it is hereby

ORDERED that

1. Mobil Exploration & Producing U.S., Inc.'s motion to vacate the judgment as it pertains to it is GRANTED, and the court dismisses Mobil's claims without prejudice;

2. Marathon Oil Company's motion to vacate the judgment as it pertains to it is DENIED; and

3. the remaining plaintiffs' motion to alter or amend the judgment is DENIED.

SO ORDERED.

---

16. Plaintiffs cite the following administrative decisions: *Columbia Gas Development Corp.*, 123 IBLA 395 (1992); *Mesa Petroleum Co.*, 108 IBLA 149 (1989); and *Mobil Oil Corp.*, 65 IBLA 295 (1982).

17. In order to bring an action under an agency regulation, plaintiffs must show either that the regulation specifically provides for a private cause of action, or, under the test articulated in *Cort*, a private action is implied. The *Cort* test has four criteria: (1) is the plaintiff one of the class for whom the regulation was enacted; (2) is there any evidence of legislative intent to create a private remedy; (3) is a private remedy consistent with the purpose of the regulation; and (4) is the cause of action one traditionally relegated to state law? *Id.* at 78, 95 S.Ct. at 2087–88. Although not necessary to this holding, the court believes that the reason plaintiffs have not attempted to bring such an action is because none exists.